Smith, Special Judge.
Complainant, David Ivey, al *298 leges in his Lili, thatNorth Carolina has issued to the pre-sidentand trustees of the University of said State, amili-tary warrant for one hundred and fifty acres of land, to be laid off within the limits of land reserved by law for the officers and soldiers of the continental line of said State, which warrant recites, “that it was for the services of David Ivey (a balance) a musician in the line aforesaid, in the revolutionary war, who died in the service of the United States, or since the close of said war, without issue or heir, and whose real estate became thereby escheated and belongs to the president and trustees of the University aforesaid, which warrant is numbered 456, and dated 21st August 1820, which has been adjudged valid by the commissioner of West Tennessee. That a certificate has been issued thereon, specifying the number of location they were entitled to make by virtue thereof, dated first Wednesday in November 1820; that said warrant was assigned by Samuel Dickens, who had authority to do so, on the 23d day of December 1820, to the defendant, Nathan G. Pinson; that on the 19th day of June 1821, said Pinson made an entry founded on said warrant, in the county of Madison, No. 662, of 154 acres of land, in the 9th surveyor’s district, 2d range and 7th section setting out the boundaries, which was surveyed the 10th day of December 1821, and that the plat and certificate of survey have been lodged in the Register’s office for the purpose of obtaining a grant in his own name. Alleges that plaintiff is the David Ivey mentioned in said warrant; that he is in full life, entitled to said warrant, and never has transferred his interest therein to any — states he did not apply for said warrant because it has been many years since he left the State of North Carolina, and is poor, ignorant, illiterate and old; that he is necessitous and a pensioner of the United States — prays that said Pinson may be enjoined from getting a grant for said land on said warrant, and that the said land may be decreed to him, and such other and further relief &c.
Defendant, Pinson, admits said warrant was assigned to him by said Samuel Dickens, for said president and frus- *299 ■tees; states that Dickens and the president and trustees were indebted to him, and assignedkaid warrant in satisfaction thereof; that he had no notice of the complain-án t’s claim — admits the warrant is located as set forth in the bill, and alleges he sold it to Daniel Harkins, before filing the bill,,' at five dollars thirty cents per acre, and gave a bond for title; has received part of the price in money, the residue by the assignment of a judgment — alleges that he does not know whether complainant performed services in the North Carolina line of not, and requires strict proof, and by no means admits said Ivey is the person tor whose seryices said warrant issued, and requires full proof of all said allegations; insists that if complainant is the same man, he has abandoned his claim for so muchas this warrant issued for; that he neglected to apply for said warrant for such great length ■ of time that the legislature of North Carolina, by a tribunal established for that purpose, adjudged that this warrant belonged to said president and trustees and issued it to them, having legal power and authority to do so: — and that complainant is barred by his neglect in not applying for his warrant, and by the lapse of time and the adjudication of said board of commissioners from claiming the warrant or any thing therefor — and insists that if complainant is injured he can only have redress against the president and trustees for damages, — not against him for the land. Insists that by virtue of an act passed 14th day of August 1822, and the proceedings which have taken place under the same, the title to this land, located by virtue of said warrant, is vested in the assignee of said president and trustees, and that no grant can legally or ought to issue to complainant — insists complainant would never have applied for or obtained said warrant; that the,same was issued by the secretary of North Carolina to said president and trustees, at their expense, by virtue of the laws of that State, and that complainant has no equitable lien on the same, and that if he is entitled to a warrant from said state, the issuance of this will not prevent his getting it, on application. Alleges that the recovery, if effected, *300 is not for said complainant but for Francis M’Gavock, and, perhaps, some others who have pretended to purchase it for a feigned consideration, and that said sale and this suit are utterly void and the court will not exercise their jurisdiction to enforce any decree against defendant. Insists that if any decree can be made he is entitled for expense, trouble &c. which in this case he thinks would be two thirds of the whole land — upon the coming in of which answer, complainant filed an amended bill making Daniel Harkins a defendant. To which Daniel Harkins put in his answer, insisting on the defence made by Pinson, and also alleging that he took possession of said land and has retained it, and made valuable improvements thereon, worth seventy five dollars, and has cleared about twenty two acres of the value of one hundred and ten dollars, and if decree is made against him he is entitled to the value oí all. The answers arc replied to.
*299 '
*300 The testimony, which, (besides the copy of the warrant) consists of the depositions of John M’Callisler and David Passmore, I consider it unnecessary to detail minutely, but shall merely say, if it be admissible in point of quality or degree, it satisfactorily establishes, that complainant, David Ivey, did enlist as a soldier in the continental line of the State of North Carolina in 1777: that he remained in the army until 1780, the siege of Charleston, when the witness was taken prisoner and saw him no more until the end of the war; that during his service he acted at one time as drummer for something less than a year; was subsequently an artificer and then a wagoner. Witness saw him directly after the war, and understood from him that he had served during its continuance. The witnesses depose to such intimacy of acquaintance with him, that all question of identity is at rest if they are to be credited, and nothing is offered to impeach their veracity.
It has, however, been strongly urged by defendants that the testimony offered upon the present occasion, being that by depositions, is insufficient in point of quality; that, it is against the rule which requires that the best attaiua- *301 blc evidence shall he adduced to prove every disputed fact, — alleging that the muster rolls in the archives of North Carolina would be better evidence of the fact, true. And certainly, no rule of evidence can be more firmly established, or upon better reason, than that which requires a party to adduce the best evidence which the nature of his case admits of. It becomes then important to ascertain what are the facts in dispute between the parties, and what testimony the foregoing rule requires for their solution of proof. The parties agree in their pleadings that David Ivey, a musician, did serve in the continental line of the State of North Carolina, and by such service became entitled to the warrant in question. The whole controversy, then, is about the identity of the plaintiff. Is he the David Ivey who actually performed the service? And it seems to me this is a question in the solution of which the muster roll could afford no aid, and would be wholly useless — it is a question which, from the very nature of it, cannot be so well investigated in any other way as by Parol proof. I am therefore of opinion, that the testimony offered is sufficient in degree, and establishes, in fact, that the complainant is the David Ivey for whose services the warrant issued.
The claim of the complainant has been opposed, on the ground of lapse of time, and it is insisted that after so great a length of time, he is barred: and it must be admitted that this would be a strong and, probably, unanswerable defence if defendant claimed by a title adverse to the soldier’s, as if he had held in his own right, the proper length of time to create a bar. In this case, however, the first adverse claim ever set up, was in August 1820, when the warrant issued, and this bill was filed in September 1822. Before the issuing the warrant, no one was setting up any claim adverse to complainant’s. I am, therefore, of opinion that neither the statute of limitations, properly so called, nor lapse of time, by analogy thereto, will operate to prevent a recovery.
It is insisted and relied upon in the answers and arguments that defendants are purchasers for a valuable con- *302 sidcration, without notice. But in reality there is noih-ing in the case to support such defence. In the first the doctrine on the subject is, that notice before the payment of the price, or the execution of the convey-anee, is equivalent to notice before the contract. Here the conveyance is not yet executed and there is no proof that the consideration is paid. See Sugden on Vendors 520, and the authorities referred to. If it were a question requiring minute investigation on the subject of notice, I have no doubt that the warrant in question does, upon its face, carry notice to all who claim by or under it. This court has also decided in the case of Craig vs. Fee-land and others, that the doctrine of purchaser for valuable consideration, without notice, does not apply between equities, and that a purchaser of a chose in action, or of any equitable title, must always abide by the case of the person from whom he buys, and that in such cases, the rule is, he who is first in time is best in right. See Sug. on Vendors 513-14.
It is also insisted that in point of law, the case supposed by the warrant is one in which an escheat had really fallen, or taken place, and that defendants in right, are entitled to the warrant. Without entering into a minute investigation of the kind of property to which the law of escheats is applicable, it is sufficient to say, that, if in fact, any escheats had fallen, previous to the act of session in 1789,'the right, accruing thereby, belonged to North Carolina in her sovereign capacity and passed to and vested in the United States by the act of session, as effectually as any other right transferred. A contrary doctrine involves serious considerations. If they did not pass to the United States by the grant, they remained in North Carolina as part of the old Dominion-, and, according to the argument for defendant, she could have retained the interest, herself, as well as to have passed it to the president and trustees of the University. And in such case, retaining, as they insist, the right of sovereignty, she could originate laws for the government of such, her territory, and institute courts for the trial of causes in *303 relation to it — a consequence, wholly variant from the ture and design of the cession: and, therefore the doctrine is inadmissible.
But the defence, mainly insisted upon, is that the commissioners under the act oí North Carolina 1819, the Governor, the Treasurer and the Comptroller, were a court, having, by law, competent jurisdiction and full power, to hear and determine all things in relation to the issuing of military land warrants; and, amongst other things, having power and authority to decide the particular question in relation to, and for the investigation of which, this suit is brought. That having, in their judicial capacity, heard and determined the matter in controversy, their adjudication is final, irreversable and conclusive, on all the world. And it is a well established rule of law, “that a judgment, by a court of competent jurisdiction, upon the same matters, between the same parties, and for the same purpose, is conclusive. And 1 take it, this rule extends to all courts, whether courts of record, or not courts of record, domestic or foreign, 1 Stark. Ev. 208. The reason given is, that the point has been already decided, in a suit between parties or their privies by a competent authority, which renders future litigation useless and vexatious. 1 Stark, on Ev. 212. in order to establish this conclusiveness of a judgment, the court which pronounces it must have jurisdiction of the cause and of the parties. 9 Mass. Rep. 462 Bissell vs. Briggs, 1 Stark. 215. It becomes, then, important to decide upon the power and authority intended to be given to the commissioners by the act of North Carolina, passed 25th December 1819. The operative words are, “that the Governor, Public Treasurer and Comptroller, or a majority of them, are hereby vested with fall power and authority to hear and determine all applications which may be made for military land warrants, and their direction in writing, or the direction in writing of a majority of them, shall authorize the Secretary of State to issue a warrant for such quantity of land, as they or a majority of them may certify 1 to be due to each applicant. This law was passed to car *304 ry into effect the power which was reserved to North Carolina, in what is usually called the compact act, passed 1804 ch. 14, by which it is stipulated that North Carolina “reserves, exclusively, the right of issuing military land warrants.” It is one of a series of acts on the same subject. Upon the 23d December 1811 she enacts, that, “it shall not, hereafter, be lawful for the Secretary of State to issue any military land warrants, excepts under the following restrictions: Any person claiming any military land warrant in his own right, shall produce, at least, one deposition, shewing that he is the person entitled to such warrant, together with the certificate of two Justices of the Peace that the deponent is entitled to credit, and also the certificate of the clerk of court oí pleas and quarter sessions of the county, where such justices reside, certifying that they are acting justices with the seal of the court annexed. The act also contains directions for procuring a warrant of attorney and by guardian for his ward.
On 11th day of December 1807, the legislature of North Carolina had enacted, that no military land warrants should issue without a resolution of the General Assembly empowering the Secretary to issue such warrant, unless the person, in whose name application is made for such military warrant, appear on the muster rolls, and to be fairly entitled to such warrant; in which case the Secretary might issue them. These acts, and others on the subject, were designed to render effective a stipulation in the act of 1789, ch. 3, usually called the cession act, to the following effect: “that the lands laid off or directed to be laid off by any act or acts of the General Assembly of this State, for the officers and soldzei’s thereofj their heirs and assigns, respectively.” It will occur to all that the chief end in this stipulation was to secure to each military claimant, the quantity of land to which he was entitled, and that it could scarcely be thought, they were attempting to provide for the adjudication of questions, which would, naturally, in the course of human conduct, arise, such as, whether the warrant were, in fact, assigued, in *305 person or by attorney: whether the assignment were fair and hona fide, or surreptitious, fraudulent, and without con-sideralion — whether the applicant were beneficially entitled, or held as trustee for another?
These are questions in the decision of which North Carolina had no particular interest, and which there was no particular reason the Secretary should decide. Accordingly, we find, that neither the Secretary m the first two acts, nor the commissioners in the third, have power given them to compel the attendance of parties to litigate conflicting interests, or to summon witnesses to investigate such interests, and, as was remarked in the case of Comegys et. al. vs. Yasse, by Mr. Justice Johnson: “it cannot be presumed it was the intention of government to clothe them with an authority so summary and conclusive, with means so little adapted to the attainment of the ends of substantial justice;” 1 Peters’Reports 212. I consider the acts as mainly designed to ascertain the amount and validity of each land warrant, leaving the right to it to be settled in the ordinary courts, according to established law in each particular case — and, therefore, that according to the terms of the act itself, the commissioners had no judicial authority to decide on confiiction of claims to any particular warrant.
I should also be of opinion, that North Carolina did not by the cession act of 1789 and the compact act of 1804, reserve to herself any right to institute courts for the adjustment of conflicting claims to lands in the ceded territory — such a right would be derogatory to the principal act, (to wit) the cession of territory, and to be sustained must be plainly and unequivocally provided for by the treaty of cession, not left to vague and doubtful inference.
To say North Carolina did reserve such rights would involve us in serious difficulty. If the laws of descent should differ in the two States as they are known to have done from 1795 to 1796 with relation to the right of daughters and sisters to inherit equally, with brothers and sons (and, indeed, it must have been in some degree, accidental that the difference did not continue longer,) by *306 what law should the courts of North Carolina be govern»ed in the decisions? if by the laws of Tennessee, then could be no sufficient reason to commit the exposition and execution of the municipal laws of Tennessee to a foreign court. If, on the contrary, they were, in their adjudications, governed by the laws of North Carolina, it would involve the inconvenience of real estate, situate in one country, being transmissible according to the laws and institutions of another. As, therefore, there is no provision that North Carolina should have power to erect courts, for the decision of conflicting claims to the ceded lands or warrants for them, I think she did not possess it and that she could impart neither to the Secretary or commissioners any jurisdiction in such case.
But if North Carolina had power to erect such court, with the powers contended for and had actually done so, it is exceedingly questionable whether the act in the case under discussion, could have the effect contended for, by reason that the tribunal in this particular case had not jurisdiction of the parties. That 1 may be understood, I will illustrate this position by a case or two. A court of competent jurisdiction grants administration upon the estate of a living man — it is merely void, and yet the court must have received proof of his death before the grant, — why is the decision of a court of competent jurisdiction in such case wholly void? It seems to me it is for want of jurisdiction of the party — he was not, nor by possibility could be before the court: as far as he was concerned, the court were deciding upon a case in which he could not possibly be a party, upon a supposed state of facts demonstrably false. Again, a person files a bill against covenantor for specific execution of a contract with his ancestor, the covenantee stated to be dead, a trial is had, the court vests the property in plaintiff, having full jurisdiction of the cause — it turns out subsequently the covenantee is living, and he claims the specific performance of the contract, or damages in stead, the decision in the first case shall be wholly void. The court has jurisdiction of such causes and authority to hear and de~ *307 termine — why is the sentence inoperative? It seems to be, because the court bad no jurisdiction of the party, and could by no possibility have in the case supposed. It seems to me that all proceedings in escheat or otherwise, which have for their basis the death of an individual, and are intended to operate on his estate in consequence of such death, are absolutely null and void, as against his interest. It has been said, though, that the proceedings in this case may be supported upon the same principle and reason, which govern the admissibility of a judgment, decree or verdict, where it is allowed to operate as evidence against strangers to the original suit, where the proceeding is, as it is technically called, in rem. It is said by Starlde in his treaties on Evidence, 1 vol 228, “this happens where a court exercises a peculiar jurisdiction, which enables it to pronounce on the nature and qualities of a particular subject matter of a public nature and interest, independently of any private party.” It is said to comprehend cases of marriage, bastardy, tes-tamenta ry matters in the spiritual court, decisions of courts of admiralty, judgments of condemnation in the exchequer, and adjudications upon questions of settlement. It will he observed that marriage, bastardy, testamentary matters and cases of settlement involve questions purely relating to political regulations, and which do not immediately involve pecuniary interests, as they are intended to establish the relation which particular individuals maintain to the community at large; there is a sort of propriety in such proceedings being admitted as evidence against each individual of the community, and as such relations are contracted without reference to the will of the public, so there is no impropriety in saying all shall be bound incidentally, by their operation. In the other specified cases, (to wit) — decisions in courts of admiralty and condemnation in the court of exchequer, it is a principle of their proceedings, founded on notions of policy, to decide upon the thing itself. Their judgments are founded on the idea that the property in controversy is subject to the immediate controul of the court, and, af *308 ter all, they may be treated as cases having their foundation more in public policy, grounded on the almost utter of calling all concerned before the court and the necessity ihat private rightshould, in some degree, be subservient to public interest, than in any settled principle of right. They are anomalous cases, and I think courts should be careful not to extend their operation.— I confess I have been at a loss to discover the analogy between those cases and the one under discussion. This is a private right advanced by an individual to real estate, in which I cannot perceive any similarity to proceedings in rem. On the contrary, I think in the whole course of our judicial polity, it cannot be found that an individual can be deprived of his inheritance, by an ex parte proceeding of which he has no notice.
It has, however, been urged that let defendants’ title be as it may, yet, plaintiff has no right which this court will support. And it is certainly a rule of this court, and of all courts, I take it, that plaintiff must show in himself, a right to the thing in dispute — until he does so, “melior est conditio defend,éntis.” It is therefore, necessary to inquire by what right plaintiff seeks to recover, and upon-what principle he asks for the aid of this court. After the frequent references made in the course- of the argument to the acts upon this subject, it seems almost unnecessary to particularize them. However, in 1782, ch. 3, North Carolina enacted that the continental officers and soldiers, in the service of the State, should be entitled to certain portions of public lands, in 'said act prescribed; and appointed commissioners to superintend the laying off the land to be appropriated to the purposes of said act, and by an act passed in 1783, ch. 3, it is provided, that the Secretary of State shall issue warrants of survey to those entitled by the first act — said act also appointed a surveyor, and directed the issues of grants on surveys when returned to the Secretary’s office. It has been before seen that by the cession act of 1789, it was explicitly declared and agreed upon by the parlies thereto, that the provisions of these acts should be made effectual; and in *309 the words of said act, the land laid off, or directed to he laid off, by any act or acts of the General Assembly of this State for the officers and soldiers thereof, their heirs and assigns respectively, shall be and inure to the use and benefit of said officers, their heirs and assigns, re-speclively.
I think from the recited acts, it is established that North Carolina was, at and previous to the cession of 1789, a trustee for the officers and soldiers of the continental line, for the quantity of land they were respectively entitled to by those acts; for altho’ the old notion was that the King, nor any corporation could be seized to a use, and the same doctrine at first prevailed in relation to trusts— this has been altered, and, it is now settled that the King-may he a trustee, 1 Cruise’s Digest 481. 1 Ves. 453, and that a corporation may he a trustee not only for its own'members but for third persons. 1 Cruise Dig. 481. 2 Ves. jr. 46. 7 Bro. Parl, cases 235. This trust estate was so far from being attempted to he abrogated by the act of cession, that it was expressly recognized and ratified by it, and if it were not so, it is a principle of this court that wherever a trust is sufficiently created, it will fasten itself on the land. 2 Johns. Chy. Rep. 389. 1 Ves. 486. 1 Cruise 482. So that if a conveyance or devise by which a trust is created, become void by the incapacity or death of the grantee, or devisee — still this court will decree the trust to be carried into execution.
The relief is administered by considering the land in whatever person vested, bound by the trust, 1 Cruise 482.
An estate was devised to the clock makers’ company upon certain trusts; decreed, thattho’ the devise was void, the clock makers’ company being not capable of taking, yet the trust was sufficiently created to fasten itself upon any estate the law might raise — Ibid. These things being so, it results, I think, that the trust became incorporated with the land and land warrant, so as to effect all subsequent takers according to the principles of this court, it being a rule here that no act of a trustee shall prejudice a cestui qae trust. I Cruise 525. 3 P. Wms. 215. And where *310 a purchaser has notice of the trust, tho’ he pays a valua-hie consideration he shall he subject to it; for says Lord “he throws his money away of his own free will.” 3 Aik. 338. 1 Johns. Chy. 575.
It has been much insisted upon in this cause, that if commissioners had no authority to decide the question of right to the warrant, then the issuing of the warrant in question, was an illegal act and void, and being so, plaintiff can take no advantage of it, and that the same cannot inure to his benefit, hut must be wholly without effect. According to the opinions herein before expressed, the commissioners and secretary had simply the power of issuing a warrant, without deciding to whom it should belong, but leaving the decision of that question to the ordinary rules of law. It would follow, then, that any stipulation, proviso or condition annexed to the warrant when it issued would be void and inoperative, and the warrant itself stand unaffected by the unlawful stipulation, proviso or condition. This would be the rule of common sense on the subject and, it seems to me, is supported in principle by divers authorities. Sugden in his treaties on powers, speaking of the effect of excessive executions, says: “where the fund -was given to a son, who was an object of the power for life, and after his decease to his wife and children, who were not, but in case he should die without leaving a wife or child, him surviving, then to his sister who was an object of the power, the trusts for the wife and children were determined by Lord Alvanly to be bad, but he, at the same time determined that if the son should die without leaving a wife or child surviving, the gift over to the daughter would be good, 547; and again in page 548, so that a gift to an object writh a gift over in a particular event, to a person not an object is void only as to the gift over. So in page 549 he says, where there is a complete execution, and something ex abundantia added, which is improper, there the execution shall be good and only the excess void; but where there is not a complete execution of the power, and the boundaries between the excess and execution are *311 not distinguishable it will be bad. And in page 551 he says: “as to conditions annexed to the gift not authorized by the power — in these cases the gift is good and the condition only is void, so that the appointee takes the fund absolutely, as if an appointment should be made and a condition annexed to it, that the appointee shall release a debt owing to him, or pay money over, the appointment would be absolute and the condition only, void, because the boundaries between the excess and the proper execution are apparent. So, if the power be only to give the property unconditionally, and it be exceeded by directing the portions to be paid, at the age of twenty one or day of marriage, the appointment will be reformed so as to make the portions vest at once. Other instances are given which I think in effect, establish the position, that when, in an appointment, the legal can be separated from the illegal parts, the part which is consistent with the power shall be valid.
Sugden in his treatise on powers 319, says: the distinction between a power and a trust is marked and obvious: powers are never imperative — trusts always imperative and obligatory upon the conscience of the party intrusted. But sometimes trusts and powers are blended — a man may be invested with a trust to be effected by the execution of a poiver given to him, which in that caséis imperative and if he refuse to execute it, or die without-having executed it, equity on the general rule, that the trust is the law, will carry the trust into execution at the expence of the remainder man, and without any regard to the person in whose favor it is to be executed, being a mere volunteer. In same book 394, it is said, and in Brown vs. Higgs 8 Ves. 574, Lord Eldon stated the principle of all the cases on this subject to be, that if the power is a power, which it is the duty of the paity to execute, made his duty by the requisition of the will, put upon him as such by the testator who has given him an interest extensive enough to enable him to discharge it, he is a trustee for the exercise of the power, and not as having a discretion whether he will exercise it or not; and the *312 court adopts the principle as to trusts, and will not permit liis negligence, accident or other circumstances to disappoint the interests of those for whose benefit he is called upon to execute it. And in Harding vs. Glynn, Harding devised certain articles to his -wife, but did desire her at or before her death, to give the same unto and amongst such of his own relations, as she should think most deserving and approve of — held to be a trust for the relations in default of appointment. That it operated as a trust in the wife by way of power of naming and apportioning, and her non-performance of the power should not make the devise void, but the power should devolve on the court, 1 Atkyns 469.
As corroborating in some degree the view I have taken of this subject, I would observe, that the legislature of Tennessee in 1822 seem to have entertained similar opinions, as the commissioners appointed under their enactments, and doubtless with their approbation, (being also lawyers of high reputation) have taken from the president and trustees of the said University, in relation to warrants in a similar situation with this, upon a transfer of them to our own Universities, a covenant that they will warrant the title of said warrants and of the lands entered and granted thereon, against the claims of all other persons claiming the same warrants: and in case any of said warrants or land shall be recovered in due course oí law by virtue of such claim, said trustees and their successors in office, covenant to pay for said warrants or land so recovered. And altho’ I am far from thinking such opinions sufficient to found a judicial decision upon, 1 am yet happy to perceive the views of the legislature and of such men concur with my own.
A majority of this court is of opinion that complainant David Ivey, is entitled to the land warrant described in the pleadings in this suit; and the entry and survey founded thereon and to the land covered thereby, and direct that a decree be entered, divesting the right, title and interest of the said Nathan G Pinson and Daniel Harkins, thereto, and vesting the same in the said David Ivey, his *313 heirs and assigns forever. And that the said Nathan Gi Pinson shall, within-months from this time, assign the said plat and certificate of survey filed in the Register’s office at-to the said David Ivey, his heirs and assigns, having the same attested according to the provisions of the second section of the act of Assembly 22d April 1809, ch. 13, and that said Nathan G. Pinson and Daniel Harkins deliver possession of said tract of land to the said David Ivey, his heirs and assigns within-months from this time. And affirming in all other respects the decree of the Chancellor, heretofore made in this cause.
Whyte, Judge.
This is an appeal from the court of chancery, holden at Columbia for the 6th circuit of the State, in a suit in equity wherein the appellants were defendants, and the appellee, plaintiff.
The bill stated that the State of North Carolina issued to the president and trustees of the University of said State, a military warrant for 154 acres of land, to be laid off within the limits of the land, reserved bylaw for the officers and soldiers of the continental line of said State, which warrant recites that it was for the services of David Ivey, a musician in the line aforesaid in the revolutionary war, who died in the service of the United States or since the close of the war without issue or heir, and whose real estate became thereby escheated and belongs to the president and trustees of the University aforesaid — which warrant is numbered 456, and dated the-August 1820, and has been adjudged valid by the commissioners for West Tennessee, and a certificate has been issued thereon, specifying the number of location by which the president and trustees are entitled to make an entry by virtue of said warrant, which certificate is dated on the first Wednesday in November 1820. That Samuel Dickens, agent for said president and trustees of said University, on the 23d December 1820, by virtue of a power from said president and trustees, transferred and assigned all the right of said president and trustees of said University to said warrant to the defendant N. G» *314 Pinson; that on the 19th June 1821, Pinson made an en< ^ Qn Said warrant No. 662, in the county of Madison, " of Tennessee, of 154- acres of land, lying in 9th surveyor’s district, 2d range, and 7th section, specifying the location, and on the 10th December 1821, had the same surveyed, and the plat and certificate of survey lodged in the register’s office for the purpose of obtaining a grant in his own name. The plaintiff Ivey further stated in his bill, that he is the David Ivey mentioned in the said warrant and it is a mistake about his being d£ad, that he was a musician in the continental line of N. C. and that no other person of that name, to the best of his knowledge, information and belief was of said line; that he is now entitled to the said warrant, never having transferred his right to it in any way. He says he always understood that he was entitled to a larger warrant than 154 acres, and he does not understand what is meant by calling it, on the face of the warrant, a balance. He never received any portion of a warrant for his military services, or any compensation in lieu thereof, and avers that if any part of the warrant, thus due for his military services, has been drawn by any person, it is a fraud upon his rights, as he solemnly declares he never received it himself, or disposed of it. He further states he never applied for his warrant, because it is many years since he left the State of North Carolina. He is poor, ignorant and illiterate, old and infirm and had confidence that the public authorities would do, sometime or other, what justice and law required them to do. He further states that he is very poor, and is a pensioner of the United States in consequence of the performance of said military services. He prays an injunction against issuing the grant to the defendants, and that the land covered by the said entry founded on the said warrant, may be decreed to him, and what other relief &c.
The defendant Pinson in his answer says, that the president and trustees of the said University, by their agent, Dickens, assigned and transferred the said warrant No. 456 for 154 acres to him, on 20th December 1820 and de~ *315 iivered the same to him; that said Dickens, being indebted to him for services performed in locating, surveying and exploring lands for said Dickens and said presidentand trustces, assigned said warrant in satisfaction thereof, and at that time he had no notice or knowledge of the claim of plaintiff or of any other person; admits it is located as set up in the bill, and that he had sold it to Harkins, the other defendant, before the filing of the bill and before notice of the claim, for ‡5 30 cents per acre, and gave him a bond for a title, and has received a part of the price, and an assignment of a judgment on one M’Elroy, and one Green for the residue. That said Harkins is in possession, and has been so for more than a year passed. He says he does not know whether the plaintiff performed the services in the North Carolina-line or not, and requires strict proof of it. He further answering says, that if plaintiff is the same man mentioned in the warrant, he has abandoned his claim for so much as this warrant issued for by the great lapse oí time in neglecting to apply for his warrant. That the legislature of North Carolina, by a tribunal established for that purpose, adjudged that this warrant belonged to the president and trustees, and issued it to them, having legal power and authority to do so. He further says that if plaintiff is injured by the issuance of said warrant, his only redress is for damages to be paid by the president and trustees, and by no principle of law can he claim or be entitled to the land innocently and meritoriously secured to defendant by said warrant. He further insists, by way of defence, upon the act of Tennessee passed the 14th August 1822, ch. 3, p. 8, entitled an act concerning certain lands claimed by the trustees of the University of North Carolina, and the proceedings under it; the title to the land located by virtue of said warrant is vested in defendant by virtue of the assignment of the president and trustees. He says that the warrant was issued by the Secretary of State of North Carolina to said president and trustees at their ex-pence, by virtue of the laws of this State, and that plaintiff has no equitable claim to the same; that if he is en *316 titled to a warrant from the State, the issuance of this warrant will not deprive him from obtaining the same upon application for it.
He further answering says, that if he should be mistaken in the above points, and a decree should be passed against him, he is entitled out of the land to be reimbursed all expences in obtaining the warrant, locating &c. which,’ under the circumstances would amount to two thirds of- the land.
The answer of Harkins says, as to the right of Pinson or the president and trustees to the warrant and land, he knows nothing, and refers to Pinson’s answer, but he says he purchased of Pinson, the land described in the bill, on which the warrant is located, about the 10th of October 1821, and took Pinson’s bond for a title; that he contracted to pay $5 30 per acre, of which he paid in cash $>‘300 and assigned a judgment on M’Elroy and Green for the residue; that he took possession and has retained it ever since; that he built houses and other necessary improvements to the value of seventy five dollars, and has cleared 22 acres which is of the value of $110 — that he purchased, paid said Pinson, took possession and made the improvements without any knowledge or notice of any other title or claim, and insists he is a bona fide purchaser, for a valuable consideration without notice — he insists on the defence made by Pinson, and if the court decrees against him, he prays to be allowed for his improvements. These answers are replied to. The answers admit the issuing of the warrant by the State of North Carolina in form set forth in the bill, and the president and trustees of the University of North Carolina its transfer to defendant, Pinson, by their agent,S. Dickens, for services rendered to the said Dickens and the said trustees in locating and surveying lands for them, constituting a good consideration; the entry and location of the warrant and survey of the land, the contract of sale and purchase between the defendants, Pinson and Harkins, are all admitted by the pleadings. The defendants deny that they have any knowledge of the military services, performed by plaintiff *317 Ivey, or that he is the same person spoken of in the warrant, as having performed the said services therein alluded to, and therefore require proof of these facts.
In the defence made in the answers, it is advanced a~ gainst the plaintiff’s recovery, that they know not whether he was a soldier of the continental line of the State of North Carolina in the war of the revolution and performed military services therein, and by no means admit that he is the same David Ivey for whose services the said warrant issued. It is certain that without this proof the plaintiff cannot recover — it is the main ground, tho’ not the only one upon which he comes into this court and asks its assistance. It in fact constitutes the prima facia title to relief: it will, then, be the first examined. JohnM’-Callister, in bis deposition proves that he is acquainted with David Ivey of Dayidson county; that he first became acquainted with him in the year 1777, while they were in the army, in the 10th regiment of the North Carolina continental line: that he enlistedin the fall of 1777, but does not recollect under whom, but was attached to Capt. James Wilson’s company. To the question — what battallion was he in, and what marches did he make in company with Ivey? — he answered, “we rendezvoused at Halifax North Carolina, from thence we marched to Richmond in Virginia, halted there, sometime, and were innoculated for the small pox; thence in the year 1778, to Valley Forge m the State of Pennsylvania, where we halted some time; thence to Monmouth in the State of New Jersey where we fought the battle of Monmouth; thence to the White Plains, in the State of New York, where we continued, till in the fall I was discharged, and during the whole of the above campaign, David Ivey was in the army as a regular soldier. To sundry interrogatories put to this witness he made the following answers: when he, Ivey, first entered the army he performed duty as a musician, and was after transferred to the waggon department. 1 knew him after the war in Orange county, North Carolina, where he lived — I lived in about twelve miles of him before the war for two years, and after the *318 war, in about 100 miles of him, where 1 remained ’till about 12 years ago when I removed to the western country. Í was at his house about 5 years ago in Dickson county,in the State of Tennessee, which was the first time I knew of his removal from North Carolina — I know not at what time he removed from North Carolina. I know him to be the same David Ivey that served in the North Carolina line — I did not know any other David Ivey. I always considered the said David Ivey to be a very weak minded, ignorant man. I have understood that he is a revolutionary pensioner of the United States.”
David Passmore, a witness, in answer to sundry interrogatories says: I am well acquainted with David Ivey of Davidson county, Tennessee, and have been since August 1777, when we enlisted together, in Orange county, North Carolina, in Capt. James Wilson’s company. Ivey served as a soldier in the revolutionary war, in the North Carolina continental line and tenth regiment, and marched to theeast to Valley Forge; when the regim’ts. were reduced, he fell into the 1st or 2d regiment, I forget which. These two regiments after the reduction constituted a brigade, commanded by Gen. Hogan, in which David Ivey and myself continued two years and six months. The brigade was only in one battle in that time, the battle of Monmouth — I was in the battle. As well as I remember, Ivey about that time was in the service incident to a waggoner or artificer. Ivey served as a drummer, as an artificer and as a waggoner, but how he enlisted I do not know.— He enlisted for three years, we served together 2á years, when I was taken prisoner at the siege of Charleston, and I saw Ivey no more ’till the end of the war. After the end of the war, in 1783 or 4 we lived in the same neighborhood, 4 miles or something less, apart. He told me he served throughout the war, and after his three years were out, he enlisted again in the service continental. We lived neighbors as aforesaid after the termination of the war, for about 20 years, during all which time, I was well and intimately acquainted with him — I then moved to this western country; since then I have frequently seen *319 him in North Carolina, during my visits to that country, before he moved out to this country. I have frequently seen him in this State, staid all night at his house al times on the waters of Harpeth river, in Davidson county, where he now lives or did a few years ago, and I know him to be the same David Ivey, who served with me in the revolutionary war, and of whom I have been speaking, and I never knew any other David Ivey that served in the North Carolina line. I think he is a very weak minded, ignorant man and very unlit for business. This was always my opinion of him. He used to gamble and was apt to be imposed on and cheated out of what little he made, by which he was always very poor. I do not know that he ever drew any warrant or portion of a warrant for military services. One John M’CaJlister, who lives in Kentucky I believe, and myself were called upon to to establish some facts, relative to the services oí the said Ivey, rendered in the revolutionary war, for the purpose identifying him, that he might be placed on the pension list, which we did, and I was informed he was placed on the pension list, and now draws a pension.
The testimony of these two witnesses sufficiently prove the identity of the plaintiff Ivey, that he is the man spoken of in the warrant, referred to in the pleadings in the cause, and for whose services the warrant issued. That be performed the services alluded to and other services as a soldier in the North Carolina continental line in the revolutionary war, from August 1777, during the three succeeding years, at least, and more than probable, to the end of the war. This testimony is indeed, so satisfactorily evincive of the truth of the facts, required by the answers tobe proved, that no opposing evidence has been offered to controvert it. I, therefore, consider it an established fact, that the military warrant No. 456, for 154 acres in the pleadings, is the warrant issued for the services of the plaintiff, David Ivey, in the North Carolina continental line in the revolutionary war.
This warrant has been issued to the president and trustees of the University of North Carolina on the 21st oí *320 August 1820, upon a recital that the plaintiff, David Ivey$ died in the service of the United States, or since the close of the war of the revolution, without issue or heirs, and whose real estate thereby became escheated and belongs to the president and trustees of the University of North Carolina. The first observation occuring here, is, that from the proofs in the cause, the issuing the warrant to the president and trustees is predicated upon a mistake; upon the supposed existence of a fact which did not then, and does not yet exist; or, according to the language in the books, upon a false suggestion, the death of the plaintiff, Ivey. It, therefore, conclusively follows that Ivey is injured, that the president and trustees have obtained the warrant for his military services, to which they had no right, and by a title which did not exist, that is,by escheat. Notwithstanding this, it is contended, that by the act of Assembly of North Carolina 1780, ch. 21, sec. 2, which says that all the property which has heretofore, or shall hereafter escheat to the State, shall be and is hereby vested in the trustees for the use and benefit of the University, and by the act of 1819, entitled an act concerning military land warrants, which authorised the Governor, public treasurer, and comptroller, to hear and determine all applications made for military land warrants and their direction in writing, or, the direction of a majority of them in writing, shall authorize the Secretary of State to issue a warrant for such quantity of land as they or a majority of -them may certify to be due to each applicant,— and that the issuance of Ivey’s warrant by the Secretary in pursuance of an order from these commissioners, to the president and trustees of the University, and the assignment and transfer of the warrant by them to the defendant Pinson by whom it was located, and the land af-terwards contracted by him to be conveyed to the other defendant Harkins, who is in possession — a fee simple right to or estate in the land is vested in the latter to the prejudice of the plaintiff, and, under the circumstances, of which, the above are the principal, is thereby placed beyond the reach of recovery by the plaintiff, Ivey.
*321 I will next make some some examination into the titles of these parties, as they are alleged in the pleadings, and appear from the proofs in the cause.
The State of North Carolina by act ofher legislature, passed at Newbern in the month of May 1780, reserved a certain tract of country, to he appropriated to her troops in the continental line of her State in the war of . the revolution.
This act of Assembly is not now to he found, but it is recognized and its purport stated in her act of Assembly of 1780, ch. 3, sec. 7, to wit — to'render some effectual and permanent reward to them for their signal bravery and persevering zeal in the aforesaid services of the State; and she enacted that each continental soldier of the line of her State, who is now in service and continues to the end of the war, or such as from wounds or bodily infirmity, have been or shall be rendered unfit for service, shall have G40 acres of land &c. By her act of Assembly of Í 783, ch. 3, sec. 2, she directed her Secretary to issue warrants to each and every person entitled to land by the above acts, for the quantity to which they are by them entitled upon application, and appointed a surveyor for laying off the lands, who is required to do so: and by section 10 of the same act, she permits him, the surveyor, to lay off lands for himself in payment of these services, at the rate of 100 acres for every ten pounds.
These acts of Assembly, and the proofs above, established by the testimony of the deponents, M’Callister and Passmore, exhibit the title of the plaintiff before and at the time of the issuing his warrant to the president and trustees. This title, thus exhibited, I consider establishes a vested right in the soldier to a fee simple for the quantity of land to which he was by these acts entitled; and also establishes a lien on the lands specified in the latter act of 1783, ch. 3, sec. 7, being reserved and appropriated for the purpose of its satisfaction under the former acts — what that quantity was in the present case it is not necessary for me to determine; and whether the whole o40 acres, or any less quantity, matters not, as a particu *322 lar quantity within the limits of the acts of Assembly, is the object of the present controversy: nor is it my pro-to determine the quantity — that would rightfully he the exercise of the proper official duty of him or them authorized by law to make an examination into the facts upon which the quantity by the acts of Assembly depended. This person was, by the law and practice of North Carolina, the Secretary of State, before the appointment of the Governor, public Treasurer and Comptroller by her act of 1819. By this act she authorized and directed the last mentioned officers to hear and determine all applications for military land warrants and give their directions in writing for the Secretary to issue a warrant for such quantity as they maj’- certify to be due to the applicant. To them then, this examination as to quantity belongs after the passage of the above act: and accordingly Ivey’s warrant upon its face is staied to be issued by virtue of an order from them, for 154 acres and it is called a balance. 1 have said this title of Ivey as above set forth establishes a lien on the lands specified in the acts mentioned, and which viere known after their passing, by the name of the military boundary; but the lien was more general and extended, considering the acts' of 1780 and 1782, as a contract between the State and the soldier, and placing the State in the same light as an individual citizen, and his contract with her liable to the same rules of construction, and to be governed by the same principles as contracts in general. The soldier had not only a lien on the lands comprised within the military boundary, but on all the lands which the State had the right of granting at the time. Thus in the case of Roundcll and wife vs. Breary, 2 Yernon 482, it wms decided, that on a covenant by the covenantor on the marriage of his son, to settle lands of the value of £150 per annum, (but no lands are particularly mentioned in the articles) to the use of the husband and first and other sons and for raising portions for daughters — the covenantor died wfithout having made any settlement; the son entered on the lands whereof the father died seised, as heir, and married the defen- *323 dani, a second wife, and settled part of the land upon her, and first son, and devised the residue &c. &c. The bill was brought to have £150 of the lands whereof Henry Breary died seised, settled to the uses in the marriage articles. For defendant it was insisted: 1st, that no lands in particular were mentioned in the articles, the covenantor might sell or devise at his pleasure the lands, there being no lien. 2d. That no lands in particular are bound or mentioned in the articles, the plaintiff’s remedy must be a satisfaction out of his assets personal, as the covenant was only for him, his executor or administrator. The Lord Keeper was of opinion, that altho’ no lands were mentioned in the articles, yet the covenant should be a lien on the land, whereof Henry Breary vims then seised, unless he had purchased and settled other lands within the time limited by the articles. This case in Vernon is much stronger than the cáse before the court, for in that case no lands in particular are mentioned, whereas, in the present case they are “certain tract of country,” and commissioners appointed nominative to lay the same off, which was so done by metes and bounds, (see sec. 8, of 1782, ch. 3,) and yet the covenant was held to be a lien on all the lands the covenantor was seised of, at the time of the covenant made. And so I consider to be the effect of the contract in the preséntense on the part of the State, upon a deficiency or exhaustion of the tract of country, in particular, designated for that purpose, and liable for the discharge of the claims unsatisfied thereby. So in Freemoult vs. Dedine, 1 Pr. Wms. 429, the testator covenanted to settle lands in Rumny Marsh, and other lands, to the value of £60, on his wife for life, and afterwards makes his will, whereby he charges all his real and personal estate with the payment of his debts. On a bill by the creditors for satisfaction of their several debts, the Lord Chancellor said, with regard to the lands in Rumney Marsh, the marriage article being a specific lien on them, makes the covenantor as to them, but a trustee, and are not affected during the life of the wife by any of the none! debts.
*324 These cases show that a covenant to convey lands ere-ates a lien on the lands the covenantor was seised .of at ^me covenan^ entere<l into) which was the situation of the land covered by the entry of Ivey’s warranfc and is enough for the present case; but the principles of equity governing contracts for the conveyance of land go farther, and will compel a settlement and conveyance of lands acquired by the covenantor after the making of the covenant for that purpose as in the case of Tooke vs. Hastings, 2 Vernon 97, — and farther still, as where aman covenanted to make a settlement of £30 a year for life, out of an estate he had nothing to do with: yet the court decreed him to make it good out of an estate which he had of his own. See 1 Equ. Cases Abr. 31, ch. 4, and 87, ch. 6.
The next inquiry regards the relation between the State and the soldier Ivey, under these acts of Assembly, and the proofs in the cause above set forth, at the time of issuing the warrant. On the part of the State, she has contracted in the most solemn manner in her power to contract, to give a complete legal title, and effectuate an estate in fee simple, in a certain quantity of land to Ivey over which she had the controul, and the power to render available to him in that manner and to that extent: she had also received the consideration, his military services in her continental line in the war of the revolution; and nothing remained upon the part of the soldier Ivej'-, to be done, but to receive from her his well merited, and dearly earned reward. Still considering and viewing as we have done, heretofore, the State as an individual citizen, she stands to Ivey in the relation of his trustee, and he to her, in that of cctui, que, trust as in the above cited case of Freemoult vs. Dedine, 1 Pr. Wms. 429, where A covenanted to settle his lands in Rumncy Marsh on his wife for life and died not having done so, but having devised his lands for the payment of his debts; on a bill by the creditors, the Lord Chancellor held the articles to be a specific lien on the lands in Rumney Marsh, and the covenantor as to them a trustee for the co~ *325 venantee, anci not to be reached by the bond debts during the life of the wife. This case shows the principle -in equity, that the holder of the legal estate is the trustee of the holder of the equitable estate or interest; that a covenant to give, convey or settle certain lands, is a specific lien on these lands, and that the covenantor is a trustee, for the holder of the specific lien. I have already shown that North Carolina gave a specific lien to the soldiers of her continental line, on the quantity of land stipulated by her, and that Ivey is the holder of this specific lien, not only appearing by the issuance of the warrant, but also by the facts proved in the cause. What is her duty as a trustee? The duty of a trustee is bona fide to execute according to the undertaking, whether express or implied, whether raised by or dependant upon covenanted terms, or raised by and dependant upon the principles of equity under the circumstances. He cannot, therefore, prejudice cestui que trust by doing what his trust does not authorize, nor, in general, injure him by omitting to do what his office requires him to perform. ,1 Saunders on Uses and Trusts 290. 3d Pr. Williams 215.
But it is argued for the defendants that altho’ an express trust is created and sufficiently substantiated by the proofs, yet the plaintiff, the cestui que trust, is not entitled to the relief he prays by his bill, for several reasons:
First — It is argued that the State or Sovereignty cannot be constituted a trustee and that she is wholly unaccountable. This is a higher toned doctrine of the prerogative of sovereignty, than has ever been assumed by the government of England, and certainly by no means cor-rectin its application to a State in this Union. In England the King may be a trustee, 1 Saund. on Uses and Trusts 278. 1 Yern. 439. 1 Ves. 453. 3 Atk. 309, and the same measure of justice maybe obtained from him as from an individual under the like circumstances. It is true, that the doctrine there at present, as laid down in Com. I vol. 242, is, that no suit or action can be brought against him in civil matters — this means by mandatory or compulsive process, and it was not the doctrine there, an- *326 c.iently; for in the time of Edward 1, he might have been sued as a common person by precipe and, even now, in his courts he may he sued by petition, the difference being only in the form of the thing, the proceeding by equitable process or petition, instead of mandatory process or writ, and the judgment or decrees are substantially the same. It is true the constitution of the United States— see amendment II, says: the judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against any of the United States by citizens of another Stale, or by citizens or subjects of any foreign power; but the present case does not come within any of these provisions. The position advanced by the counsel that the State of North Carolina is unaccountable, meaning thereby, that in the present case, whether right or wrong, she will shelter herself under her supremacy, is a position, I am sure that never would be assumed by her. It would be derogatory to her dignity and honor; incompatible with justice, and militating against the whole course and tenor of her acts and proceedings heretofore, as a State, which have been characterized not only by the constant presence of these qualities, but also by general and good faith in the highest degree. I would say for her what Judge Wilson says a State is: “A body of free persons united together, to enjoy peaceably what is their own, and to do justice to others: — it is an artificial person — it has its affairs and its interests — it has its rules, its rights — and, it has its obligations. It may acquire property distinct from that of its members; it may incur debts to be discharged out of the public stock, not out of the private fortunes of individuals: it may be bound by contracts and for damages arising out of the breach of these contracts. In all our contemplations, however, concerning this feigned and artificial person, we should never forget that in truth and nature, those who think and speak and act, are men.”— Judge Wilson, continues: Is the foregoing description of a state a ¡me description? it will not be questioned but it is. Is there any part of this description, which inti *327 mates in the remotest manner, that a State any more than the men who compose it, ought not to do justice and fulfil engagements? It-will not be pretended that there is — see 2 Dallas 455, 456.
I am fully satisfied that the State of North Carolina in all her proceedings regarding her troops, intended nothing but good faith. With that mind she passed her acts of Assembly making the contract for the reward of their services; and 1 see no departure from the same mind in its execution, as far as it has progressed in the case of Ivey, which I next proceed to examine. Her public laws from the year 1782, down to the latest act on the subject, show a continued solicitude on her part, to perfect the titles and procure a speedy possession and early enjoyment of the lands — she had them entered, laid oif and surveyed, by her own office at her own expence; and from time to time invited by legislative calls and requirements, the industrious co-operation of the claimant, for the speedy execution of these acts. Itis not necessary to notice any of these acts in particular, except the last one, farther than by making one general observation which is applicable to all of them; that they exhibit the greatest degree of good faith on the part of the State, to which the last is not any exception. This last act under which Ivey’s warrant issued, was passed in 1819. It is as follows:— “That the Governor, public Treasurer and Comptroller or a majority of them, are hereby vested with full power and authority, to hear and determine all applications which may be made for military land warrants; and their direction in writing, or a direction in writing of a majority of them shall authorize the Secretary of State, to issue a warrant for such quantity of land, as they or a majority of them shall certify to be due to the applicant.”
This act gives full power and authority to hear and determine all applications made for military land warrants and to give direction for their issuance, specifying the quantity. Under the power here given, it is contended by the defendant’s counsel, that the interest in Ivey’s warrant was lawfully transferred to and vested in the {rus- *328 of the University; and the case they make is this: that North Carolina by her act of 1789, ch. 21, sec. 2, which says that all the property which has heretofore, or shall, hereafter, escheat to the State, shall he, and is hereby vested in the trustees for the use and benefit of the said University. That the interest in the lands of her soldiers who died without heirs escheated to the State, and being so escheated by this act of 1819 became the right of and was vested in the trustees of the University. That the persons appointed by the act of 1819, constituted a board of commissioners necessarily by the act possessing powers to determine what property was escheated, and what not, and of course the facts upon which the es-cheat was founded; that having heard and determined the application of the trustees for Ivey’s warrant on the ground of escheat, their determination thereon is final and conclusive upon all concerned, the State, as well as Ivey, the soldier — and that it is not to be controverted in any court that Ivey’s real estate has not escheated, as their determination, or sentence on the face of the warrant shows. Is this argument and case supported by the acts of Assembly — what is the true construction of the act of 1819? Its object and its letter will give this construction. Its object is the fulfilment and completion of her contract made by the acts of 1780 and 1782 with her military claimant: with the soldier himself or his rightful representative or assignee. This is the general object of the act — its object is directed to the issuance of the warrant in unsatisfied cases, and gives a power to direct the issuance for the quantity that may be due to the soldier or his rightful representative or assignee. This is the object of the act, and this is the power given. This is its spirit, and this is its letter. It would not be a strained construction only, it would be beyond a strained construction to say, that a power was given to issue a warrant— by which I mean, transferring the soldier’s interest to any other than the soldier himself, or his rightful representative or assignee; it would be out of her contract, out of the purview of all her acts of Assembly on the subject— *329 in short, it would he a false construction, and be imputing to the State of North Carolina, bad faith and fraud, — imputations not to be tolerated: — and as before such a suggestion is repudiated bj her uniform conduct in every part of her proceedings upon these rights. It is, therefore, my best judgment that the plain, apparent and true construction of the act of 1819, both upon its letter and its spirit, is, to give the commissioners appointed under it, the power to issue warrants only, to the soldier himself, 'his rightful representative or assignee and to no other, and that the issuance to any other for the benefit of that other is not authorized by the act. • The issuance of this warrant, therefore, to the president and trustees, and vesting in them the inchoate legal title to the land of Ivey, to which he had, at the least, the clear and undisputable right and title in equity, was an excess of jurisdiction, and an exercise of a power not given, or intended to be given. But this power has been exercised, and innocently, as I must believe, under the circumstances. The board of commissioners, considering the great length of time this claim has lain dormant without any prosecution, might have supposed and believed, that Ivey was not only dead, but dead without heirs, and the interest of his claim belonged to the University; and also believed the presidentandtruste.es,under the actof 1789, tobe the rightful representative; and, therefore, without any inference of fraudulent intention, issued the warrant as on its face purported. The issuance of Ivey’s warrant by this board would not have acquired a greater effect, if the supposed escheat in the case had been sanctioned by a finding, upon an inquisition duly taken pursuant to the act of 1715, ch. 30, or by some other means prescribed bylaw showing the escheat, and in appearaneewarranling this proceeding; but it is not necessary to notice this point further, as the record does not show any such ground for its issuance. It seems to me then, that the issuance of Ivey’s warrant in the manner it has been done, by the' direction of the board is founded on mistake. But in this point it is contended for the defendant, that whether by mistake or *330 otherwise it is not inquirable into, being the act of a tribunal constituted with full powers to hear and .determine. A question, analogous to this in its principle, arose on the Pennsylvania act oí 1792, entitled “-an act for the sale of vacant lands within the commorfwealth.” Disputes existed between the claimants under the act, the hoard of •property having taken the opinion of the! attorney general, settled a form of certificates, upon the pursuance ■ of and compliance with which, patents sliould issue, and they afterwards issued of course on the prescribed form being ' complied with; on a question under the said act oí 1792 it was insisted by the plaintiff’s counsel that the board, of property in their resolves, and the Governor, by his patent, represented the State, pro hac vice, and that interests vested under them which could not afterwards be defeated. The court, Tates, Smith and Brackenridge, justices, say, “we cannot subscribe thereto,” and they say that the Governor and the board of property cannot by their own acts derogate from the binding force of law:1 and further, they say, we are decidedly of opinion that the patents and the prevention certificates recited in the patents are not conclusive against the commonwealth or any person, claiming under the act of 1792 of the paten-tees, having performed the conditions enjoined on them, altho’ they have pursued the form prescribed by the land oificers, 3 Cranch 42, in the notes. That being the case of a patent issued by virtue of a certificate from the board of property directing its issuance, is a much stronger case than the one before this court, which is only that of a warrant under the like circumstances, and is a decision directly in point under the principle contended for by the defendant’s counsel, touching the boundless power and unimpeachable efficacy of the certificate of this board of commissioners, directing the issuance of a warrant.
My opinion on this question is, that the commissioners under the act of 1819, as far as they acted within the power given by the act — their acts are binding; but when, bathe execution they have transcended their power, their *331 acts are not binding. The act gaye them power to issue military warrants only; — previous acts had said that when the soldier was dead, his warrant ought to he issued to his heir, or, if assigned by the soldier or his heir, to his rightful assignee. The facts, therefore, constituting this claim, as whether a soldier, or what service performed by him, whether the heir or not of the soldier, whether the assignee or not of the soldier, what the quantity of land and the portion due, with the evidence for the establish* ment of these facts, were within their proper cognizance. But to issue any other kind of a warrant for land, or to any other person, as is done in the present case to a stranger, predicated upon a title by escheat founded upon the supposed death of the soldier without heirs, or assignment, and the soldier still living and in full life, is a pretension as extravagant for the exercise of, as it is unfounded in the power given by the act. The case then stands thus: the issuing Ivey’s warrant was an act within the rightful power of the commissioners — they were the substitute of the State of North Carolina for this purpose, liaving the same powers as the State, — that is, the power of a trustee; the warrant being a step to the completion of the legal title by the grant, may be considered either as a part of that legal title and forming an inchoate legal right, or it may be considered as the evidence of an equity subsisting prior to its emanation — in either view, the result is the same; if the former, a legal right, it is attendant upon, and subject to the equitable right, in a court of equity. If it is the latter, it is in the same court, subject to the prior and better equity. The acknowledged doctrine in the case of an alienation by a trustee of the trust property contrary to the trust is, that with notice, actual or constructive, the trust is attached to the property, and the alienee becomes ipso facto, a trustee, see 1 Scho. and Lef. 2-13, Adair vs. Shaw, Lord Chancellor Redesdale says: “if we advert to the cases on the subject, we shall find that trusts are enforced, not only against those who are rightfully possessed of the trust property as trustees, but also, against all persons who come into posses *332 sion of the property bound by the trust with notice of the trust, and whoever so comes into possession is consi-as bound with respect to that special property, to the execution of the trust. ,In the case of Philips vs. Bridges 3 Ves. 127, the master of the rolls says: no act of the trustees can prejudice and narrow the title of the cestui que trust-” and again, in the case of Shelby vs. Alston, 3 Ves. 341, the master of the rolls repeats the same principles of equity and says: “no act of the trustee can, in any degree, vary the right of cestui que trust.”
But it has been argued against the plaintiff’s remedy that the State cannot be a trustee. I think I have already shown that the State can be a trustee, by sufficient authority. But if the State could not act in that capacity, the trust being well raised by the express provisions of a statute for the most meritorious of all considerations, services performed in defence of the country by the individual, at the expence of his health and at the risk of his life, still it would not benefit the defence; for the principle of equity is, that a trust shall not fail for want of a trustee; and if the trustee neglect to execute,or be disabled from executing, or die, the court will cause it to be executed, see 5th Ves. 495, Brown vs. Higgs and the cases there cited; 6 Ves. 663. 1 Bro. C. C. 81. 16 Ves. 26. But this doctrine as to the suability of a State has no application to the present case. This is not a suit where the State of North Carolina is a party, nor does it propose any act to be done by her; on those acts she hath already done, together with other acts' done by other persons, this court is called upon to act, not by impeaching the acts of North Carolina as wrong, but by enforcing them as right against those, who, it is alleged have wrongfully interested themselves, under them, aiming at their subversion and their perversion to other purposes than those for which they were originally destined.
Again, it is urged for the defendant, that the plaintiff is compelled to treat this issuing of the warrant to the president and trustees as an act of North Carolina without power, and if so it is void, and cannot be affirmed by this *333 court. The force of this argument will he best perceived from a consideration of its several parts; 1st as to the power — the warrant was issued by virtue of the act of 1819, as is purported on its face — we have already seen what was the power given by that act, to wit — a power to issue military warrants. This power, previous to the act of 1819, had always been exercised by the Secretary and constituted a part of his official duty — no new power was in fact given by this act, but only a transfer of the seat of the pre-existing power from the Secretary to the Governor, Public Treasurer aad Comptroller. This transfer of the power to these commissioners, of issuing military warrants, was of course as incident thereto, accompanied by the rules and regulations respecting the documents and evidence for the purpose of ascertaining the true and bona fide claimant, the soldier, his rightful heir, and rightful assignee, the correct amount of claim and other particulars interposed as guards and checks against substitution and imposition, which before then had been from time to time prescribed by different acts of Assembly and resolutions of the legislature, directory to the Secretary in discharge of his duty, nothing being left with the Secretary but the mere manual operation of throwing the directions of those commissioners, into the form of a warrant, and signing it. The power therefore under the act of 1819 is a good power. It is the same that was acted under by the Secretary from the year 1783 to 1819, and under which thousands of warrants issued. It is worthy of remark that during all this time the power was lodged with the Secretary and exercised by him— not one instance has occurred of the exercise of it in issuing a military warrant to any other person, than to the soldier, bis rightful heir or rightful assignee, and it never entered into his mind to issue a military warrant to the president and trustees of the University, notwithstanding the same facts upon which the present warrant of Ivey was issued to them existed for a period of 30 years, antecedent to the passing of the act of 1819. I will not say that such a practice makes the power, but it may be *334 safely said that such a practice is a strong evidence of the extent oí tne power.
2d. As to the execution of the power.' The issuing the warrant in the manner and form it has been done by the order or direction of the commissioners is not a void execution of the power under the act of 1819, it is only a defective execution. The issuing of the warrant was in execution of the power and authorized by it, but the issuing to the use and benefit of the University is a defective execution; the act of issuance or passing the inchoate interest from the State is right, and so far a proper execution, but the passing that interest to the president and trustees is wrong, and to that extent a defective execution. They, the president and trustees are not the objects of the power.' Ivey is that object, and so far as the power is defectively executed, so its correction or the remedy is within the jurisdiction of equity. The authorities on this point are clearly in the affirmative and show that a power in its execution may be in part supported, and in part set aside; that the execution, as far as it is according to the intent of the power will he declared, and as tar as it is not according to that intent, set aside. See Sugdcn on Powers 406-7, and the authorities there referred to. In Lane against Pope, Lord Hardwicke said: “Here are two questions, 1st, whether the execution of the power is good in tolo-, and 2d, whether in part and how far? and he held that the execution of the power in that case was not good in tolo, hut thatit was good in part; declared how far, supporting it to that extent, and how far not a good execution, setting it aside to that extent: Ambler’s Reports 233. This court, therefore, have the jurisdiction of examining the execution of the power given to this board, by the law of North Carolina of 1819, and correcting its defective execution as a power. The act of the commissioners in' issuring Ivey’s warrant was so far authorized by the power, because the State of North Carolina had by the act of session 1789, ch. 3, the deed oí cession by Samuel Johnson and Benjamin Harkins, of the 25th of February 1790, its acceptance by the United States by act of Con- *335 gross of April 2, 1790, and the act of North Carolina of 21st November 1803, ratified by Tennessee by act of Assembly of 4th August 1804, which was ratified by the U. States by act of Congress, April 18th 1806, and Tennessee’s ratification and confirmation thereof, September 1806, retained the right and power to issue military warrants, to be satisfied out of the lands and territory ceded to the United States; and the United States and State of Tennessee had agreed for this right and. power to be exercised and this satisfaction to be made. By virtue of these different acts and instruments, the issuance oí Ivey’s warrant and the appropriation of the land by it as stated in the pleadings in this case, is an extinguishment of power to issue on the part of North Carolina quoad hoc, and an extinguishment of the obligation to satisfy, on the part of the United States to the same extent. It was said on this point by the counsel that Ivey was not injured by the defective execution in part, (to wit) — giving the interest therein to the University; for Ivey, they say, may apply to the State of North Carolina and get another warrant. This course of proceeding would be as fraudulent as it would he foreign to the contract between the United States and North Carolina. The United States agreed to satisfy specific claims or rights, — to pay or discharge them once, not twice. If a second warrant on the same claim were admissible, the same reason would apply to the one hundredth. This, may be said is putting an extreme case — that is true, but it is thereby the plainer test of the principle on which it and the like cases must be founded. It is further said as another succedaneum for Ivey’s rights, that the United States, under the circumstances would issue a warrant. The United States might it is true by force of her power, but it would be without obligation, and how far in such a case it would be consonant tota-lice and her duty, being as trustee of that land for the benefit of the whole Union — is not for me to spend an. opinion upon. To such an application the United States might say, non in hoc vinculo veni, and her answer I am persuaded would be; I. have already satisfied that claim; *336 besides, it is the province of North Carolina to issue the warrant; without a warrant from her, the agency of the United States cannot be called into action.
I have now endeavored to show, that the issuing of Ivey’s warrant was a good execution of the power as to the act of issuance, and passing the interest of the State, but that the execution of the power, so far as it passed that interest to the president and trustees, is a defective execution. Upon this I think there can be no question, for as Lord Hardwicke said in the above case of Lane and Pope: ‘!It is so directly contrary to the interest of the power, I can hardly argue it, — nothing would be more contrary to the power and those creating it,” Ambler 234; so I say in the present case of the declaration of the interest of Ivey to the University — it is a fraud on the power, the act of 1819, and the makers of it, that is, the State of North Carolina, not meaning thereby an actual fraud, contemplated in the minds of the commissioners, by no means; for, as I said before, they acted under mistake, but a fraud in the contemplation of a court of equity upon the circumstances, and so far ought to be set aside. On this part of the case, the execution of the power, the remaining question is, as to the jurisdiction of the court in making a decree upon its defective execution in favor of the plaintiff. The argument for the defendant on this ques„ tion considers the power under the act of 1819, as a mere power, and the execution of it by the commissioners in issuing the warrant to the president and trustees, a void act, tantamount to a non-execution of the power, and, therefore, draw the conclusion that it cannot be executed by this court. If the pi-emises on which the conclusion of this argument is based, exist, the conclusion must follow: but the power given by the act of 1819, is not a mere power to the commissioners. I have considered it all along as a power given by North Carolina to them under her acts of Assembly on the subject matter in the execution of a trust on her part; and to be by them, the commissioners, acted upon according to that trust. Is not this view correct? In the relation North Carolina stood *337 to her military claimants she could not be considered by the act of 1819 as delegating to the commissioners, a mere power alone, hut a power coupled with a trust. A mcre power is voluntary — the donee of the power may or may not act upon it, as he pleases. Thus, Sugden on P. 393 says: “powers are never imperative — they leave the act to be done at the wiíl of the party to whom they are given.” “Trusts,” says he, “are always imperative and are obligatory on the conscience of the party intrusted.” “But sometimes trusts and powers are blended — a man may be invested with a trust to be effected by the execution of a power given him, which is in that case imperative.” It could not have been the intention of North Carolina by her act of 1819 to leave it with the commissioners to issue military warrants or not as they pleased, hut quite the reverse. The language of the act as rvell as its scope and intent forbid such a construction. She wanted her military claims discharged, and the titles to them perfected. In pursuance of this purpose she had required, from time to time, the claimants to come forward and obtain the warrants for their services, and had even urged the expediency of that step by threats, which her goodness and honor never would permit her to put in execution. The act cannot, therefore, he called a mere power, the issuing the warrant as an act to be done, or not done, as the commissioners might choose. The obligation of the State to have the act done, the general object of the act, under that obligation, and its constituting one of a number of acts on the same subject, forming as it were a system for tlje completion of the titles to the rights and interests of her military claimants, prove the act to be imperative. Neither, perhaps, can this act of 1819 he called a mere trust. In Brown vs. Higgs, 5 Ves. 505, the master of the rolls says: “the distinction between a trust and a power is very nice” — and the same judge says af-terwards, in the case of Kemp vs. Kemp, 5 Ves. 356, that in this court powers arc considered as trusts; but it is not important upon a question on this act to trace the discriminating line,between a mere power and amere trust,as *338 the act in strictness creates neither the one or the other;, but a power coupled with a trust for its execution, — as I have already endeavoured to show. Lord Eldon whose comprehensive mind and depth of research as a chancellor, are, perhaps, exceeded by no one, thus lays down the principles governing a court of equity on this subject.— He says, “it is perfectly clear that where there is a mere power of disposing, and that power is not executed, this court cannot execute it. It is equally clear that whenever a trust is created and the execution of that trust fails, by the death of the trustee or by accident, this court will execute it; hut there is not only a mere power, but there is also known to this court a power, which the party to whom it is given, is entrusted and required to execute.— And with regard to that species of power the court considers it as partaking so much of the nature and qualities of a trust, that if the person who has that duty imposed upon him does not discharge it, the court will, to a certain extent, discharge the duty in his room and place.” —Brown vs. Higgs, 8 Ves. 570-71.
This last case put by the Lord Chancellor Eldon is precisely the case under consideration by this court. North Carolina was the trustee of the soldiers; she had given them lands — she had contracted to make them a title. In making this title she transferred a part of the duty from her usual agent, the Secretary, in performing this business, to the commissioners under the act of 18Í9. This regarded the warrant, and was a substitution of her own duty pro tanto, a power to direct its emanation in accordance with her trust, her duty and her contract. Thc^e commissioners have not discharged this duty imposed on them, and by the above authority, this court is to discharge the duty in their room and place. Another objection to the plaintiff’s recovery is, that the defendants are purchasers for a valuable consideration, without notice. This defence can only avail when the purchase is complete in all its parts and executed. Here, there is no conveyance, and, therefore, they are not entitled to this defence, 3 Atkyns 377, 571. Beam’s pleadings 237. Neither does the *339 case admit of the allegation, that the defendants had no notice of the plaintiff’s claim and title. They had a sufficient constructive notice upon the face of the warrant, — the document exhibiting- their title, and under which they claimf There is no difference in their consequences between actual and constructive notice. In Moore vs. Fennell, 2 Ch. cases 246, extract in 2 Brown C. C. by Belt, 297, it is laid down, that in all cases where the purchaser cannot make out a title but by a deed which leads him to another fact, the purchaser shall not be a purchaser without notice of that fact, but shall be presumed cognizant thereof, for it is crassa negligentia, that he sought not after it. See the doctrine of notice, Beams Ch. PI. 243 &c. 222 &c. 2 B. C. C. by Belt. 291. Cop-pin vs. Fernhough, and cases there cited.
The statutes of limitations of this State have been pleaded as another defence to this suit, but they have no application on two grounds; 1st, from the nature of the case, — being an express trust, raised by, and dependent upon, the most solemn instruments; 2d. if the nature of the case had admitted of this defence, the time is too short for its operation.
In the examination of this case I have treated the State of North Carolina as an individual citizen and have applied the doctrines andprinciples applicable to contracts in general, to the cause. I omitted in its proper place to cite my authority for so doing, which will be received as my excuse for citing here, out of place. It is that of the supreme court of the United States in the case Hinde-kopper’s lessee vs. Douglass, a case under the act of Assembly of the State of Pennsylvania of the 3d ol April 1792, being an act for the sale of the vacant land within the commonwealth, 3d Cranch L The whole case may be referred to, but the extract I make is from page 70, where chief justice Marshall, in delivering the opinion of the court, says: “This is a contract, and altho’ a State is a party it ought to be construed according to those well established principles which regulate contracts generally.”